## CHICAGO, KALAMAZOO & SAGINAW RAILWAY CO. v. LANE.[1]

1. SPECIFIC PERFORMANCE—CONTRACT TO CONVEY—DEFINITENESS.
   A contract to convey land for a railroad right of way is not too uncertain and indefinite to be specifically performed where complainant has taken possession with the express assent of defendants and constructed its road thereon and the consideration to be paid can be ascertained by a computation of the acreage used and the amount per acre paid therefor by defendant, including interest and taxes.

2. EVIDENCE—CONTRACTS—PAROL EVIDENCE—TIME LIMIT.
   Where, prior to the execution of a contract for a deed of right of way for a railroad, two different drafts were prepared containing a limit within which the railroad must be constructed, which were rejected by complainant, after which defendants prepared, and the parties executed, one with the time limit omitted, defendants cannot by parol testimony insert a time limit.

3. VENDOR AND PURCHASER — CONTRACT — RAILROAD RIGHT OF WAY—CROSSINGS.
   Where a contract to convey land for a railroad right of way provides that the purchaser shall have three crossings over a proposed road to be built by the vendors, but contains no provision that the vendors shall have similar rights over the purchaser's road, the vendor cannot insist on the insertion of such a provision in the deed.

4. EVIDENCE—PAROL EVIDENCE—WRITTEN CONTRACTS.
   Where a contract complete in itself is entered into with full knowledge of the circumstances by men of large business experience after negotiations extending over a considerable time, it cannot be converted by parol evidence into a temporary memorandum containing nothing binding upon the parties.

5. SPECIFIC PERFORMANCE — CONTRACT TO CONVEY — RIGHT OF WAY—ABANDONMENT—EVIDENCE—SUFFICIENCY.
   On a bill for specific performance of a contract to convey land for

---

[1] Pending a motion for a rehearing, this cause was discontinued by stipulation February 6, 1908.

a railroad right of way, evidence examined, and *held*, not to support a decree denying relief on the ground that complainant had abandoned the route.

6. SAME—FORFEITURE—ESTOPPEL TO ASSERT.

Where a parol contract to convey land for a railroad right of way was not to become binding until complainant had built its road along another right of way for which it had a contract with defendants, and defendants prevented the building of the other road, they could not take advantage of the failure to build in a suit for specific performance of the parol contract.

7. SAME—EQUITY.

Specific performance, though a matter of grace rather than of right, will not be denied where complainant, a railroad company, would be compelled either to abandon its road or take proceedings for condemnation, with its consequent risks, and specific performance will give each party what was contracted for without injustice to either.

Appeal from Kalamazoo; North, J., presiding. Submitted June 13, 1907. (Docket No. 10.) Decided October 4, 1907.

Bill by the Chicago, Kalamazoo & Saginaw Railway Company against M. Henry Lane and Frank B. Lay for the specific performance of a land contract. From a decree dismissing the bill, complainant appeals. Reversed, and decree entered for complainant.

*Harry C. Howard* (*N. H. Stewart*, of counsel), for complainant.

*Dallas Boudeman* and *Alfred J. Mills*, for defendants.

Complainant owned and operated a railroad from Woodbury on the north to Kalamazoo upon the south. It desired an extension to the south so as to connect with some trunk line running east and west which would increase its facilities for travel and freight. The defendants owned several parcels of land and intended to con-

struct a belt line passing around the business portion of the city of Kalamazoo on the north, east, and south, and forming a connection with other railroads passing through the city of Kalamazoo. It would also pass most of the manufacturing plants in the city. A route had been surveyed from a point near the terminal of complainant's railroad to what was known as the Bryant Paper Mill, and also other land known as the Reed Farm, lying a short distance east of said mill.

Defendants desired a railroad to be thus constructed for the purpose of enhancing the value of their land lying along the river. One Hays, a real estate agent, entered into negotiations with the complainant and the defendants for the extension of complainant's road along the line of the proposed belt line road. The Southside Improvement Company was organized and the defendants conveyed to that corporation a portion of the lands owned by them for the sum of $33,853.22. The Improvement Company was capitalized at $80,000. Hays entered into negotiations with Mr. Dewing who acted for the railroad company and persuaded the officers and the stockholders of the company to take $8,000 of the capital stock of the Improvement Company. The result of the negotiations was that the officers of the railroad took $8,000 of the stock, and the following contract was made between Mr. William S. Dewing and the defendants:,

"This contract, made this twenty-second day of June, A. D. 1899, by and between M. Henry Lane and Frank B. Lay, both of the city and county of Kalamazoo, and State of Michigan, parties of the first part, and William S. Dewing of the same residence aforesaid, party of the second part.

"*Witnesseth:* That the said parties of the first part, in consideration of the sum of one dollar and other valuable considerations herein recited, to them in hand paid by said party of the second part, do hereby agree that they shall and will at any time before January 1st, 1901, following from the date hereof, at the written request of the said party of the second part, execute and deliver to him,

or to any person or persons as he the said party of the second part shall direct in writing, a good and sufficient warranty deed of the following described land, situated in the county of Kalamazoo, State of Michigan, to wit:

"Two rods of land lying northeast and south of proposed right of way of Belt Line Railroad as per survey commencing at the west side of Oxbow nearest present terminal of C. K. & S. R. R. and continuing to and along said Belt Line right of way to east side of Portage street. Also two rods of land lying on the north side of main Belt Line of railroad commencing at junction of crossing and running thence east along main Belt Line two rods wide to the east boundary of land owned by said first parties. Privilege to cross said Belt Line Railroad not to exceed three times. The curves as laid out on map shall be reduced to curves not sharper than three degrees. It being understood this deed conveys only such portion of lands for said right of way as belongs to said first parties. Also the right to cross the main line of Belt Line as extended east, and any branch of said Belt Line as per map showing survey of said Belt Line and branches, for the sum of $1,000 more or less, payable as follows: On delivery of warranty deed free and clear of any and all encumbrances on or before January 1st, 1901. It is hereby understood the value of right of way or purchase price to be paid is based and to be computed upon cost of land per acre to said first parties with interest at seven per cent. from date of purchase and pro rata of taxes paid.

"And the said parties of the first part do hereby further agree that they shall and will not, before January 1st, 1901, sell, convey, mortgage or otherwise encumber the said land, or any part thereof, or do any act or deed to diminish or encumber the title to said land. It is hereby fully understood and agreed between parties hereto that this option is given and accepted upon basis that said first parties may be able to secure release of mortgaged premises upon payment of a reasonable sum not less than purchase price paid.

"It is agreed by and between the parties hereto, that if the said party of the second part at the expiration of the aforesaid limited time shall have declined or omitted to make application for the purchase of said land at the price aforesaid, then this instrument shall be void, and the above sum of one dollar so paid as aforesaid shall be forfeited by the said party of the second part, and the said

parties of the first part shall have the right to retain the same, as and for liquidated damages, and the said party of the second part shall relinquish to said parties of the first part all claim to said land, either in law or in equity, and also all claim to the said sum of one dollar so paid as aforesaid, and no claim of the said party of the second part under this contract shall then be effectual.

"In witness whereof, the said parties have hereunto set their hands and seals the day and year first above written.

"In presence of
"CHAS. B. HAYS.
"J. H. DEWING."

"M. HENRY LANE.        (Seal)
"FRANK B. LAY.        (Seal)
"WILLIAM S. DEWING. (Seal)

W. S. Dewing, J. H. Dewing, and Edward Woodbury were the officers of the railroad company and owned most of the stock. The defendants did not own all of the land over which complainant's right of way was to extend. Being unable to agree with the owner of one piece over which it was desired to extend their road, they agreed to deviate their line, and made the following contract with the defendants for the purchase of a right of way which would give them a continuous line:

"Articles of agreement, made this 28th day of August in the year of our Lord one thousand nine hundred between the Chicago & Kalamazoo Terminal Railway Co. and M. H. Lane and Frank B. Lay, of the City of Kalamazoo, Michigan, parties of the first part, and William S. Dewing, of the same residence, party of the second part, in the manner following: The said parties of the first part, in consideration of the sum of one thousand dollars, to be to them duly paid, hereby agree to sell unto the said party of the second part, all that certain piece or parcel of land lying and being situated in the city of Kalamazoo, county of Kalamazoo, and State of Michigan, and more particularly known and described as follows:

"Commencing at a point on the south line of Lake street in the city of Kalamazoo, where the easterly line of the right of way of the Chicago & Kalamazoo Terminal Railway Co. crosses said south line of Lake street, thence southerly along the easterly line of said right of

way to the right of way of the Grand Rapids & Indiana Railroad Company, thence northwesterly to a point on the south line of Washington avenue where the westerly line of the east two rods of the right of way first mentioned crosses Washington avenue, thence northerly along the westerly line of said east two rods to the south line of Lake street, thence east two rods on the south line of Lake street to the place of beginning, together with the right and privilege to slope one rod of land next west at the above-described strip, at such places where cuts may be made for the purpose of grading and laying tracks on the right of way agreed to be sold by this contract.

"Said first parties also agree to sell to said second party a joint interest in the reservation made by the grantors in a certain deed recorded in liber 101 of deeds in the office of the register of deeds of Kalamazoo county, at page 328, for the said sum of one thousand dollars, which the said party of the second part hereby agrees to pay the parties of the first part, as follows: Within thirty days of the date hereof.

"Said second party is to have the right at once to prepare said land for a railroad track.

"It is mutually agreed between the said parties that the said party of the second part, shall have possession of said premises forthwith, and he shall keep the same in as good condition as they are at the date hereof, until the said sum shall be paid as aforesaid; and if said party of the second part shall fail to perform this contract, or any part of the same, said part__ of the first part shall, immediately after such failure, have a right to declare the same void, and retain whatever may have been paid on such contract, and all improvements that may have been made on said premises, and may consider and treat the part__ of the second part as __ tenant holding over without permission, and may take immediate possession of the premises, and remove the part__ of the second part therefrom.

"And it is agreed that the stipulations aforesaid are to apply to and bind the heirs, executors, administrators and assigns of the respective parties."

After the first contract was executed Mr. William S. Dewing gave the defendants a letter reading as follows:

"*Gentlemen:* I hereby agree that the option dated June 22, 1899, for right of way adjoining our Belt Line, shall not be sold to other parties, and if deed is executed

under the same and delivered to me, I further agree that I will build, or cause to be built, a railroad upon this right of way, or in case of failure to do it, I will deed back to the Messrs. Lane and Lay, upon receipt of purchase price of right of way. And I further agree that I will build or cause to be built the three crossings mentioned in the said contract, but not build any interlockers thereto, and should other crossings be required, the railroad crossing the first railroad shall bear the expense of the same."

It was thoroughly understood by all parties that the contracts with Mr. Dewing were in fact made with the complainant, and that Mr. Dewing was acting for the complainant. The evident purpose of this communication was to remove any question as to the right of Mr. Dewing to assign the contract to any other company.

The first contract was deposited in escrow with Mr. Hays, to be delivered to Mr. Dewing when he had subscribed or caused to be subscribed $8,000 of the stock of the Southside Improvement Company. Mr. Dewing and his friends subscribed and paid for this stock, and the contract was delivered to him by Mr. Hays. Mr. Dewing soon after assigned the contract to the complainant and it entered upon the construction of its roadbed and track. No question ever arose as to its location. Defendants assented to it, were present while the work was going on, and made no protest or objection. The roadbed was constructed to the tracks of the G. R. & I. R. R., towards the Bryant mill. A spur was also constructed extending to the east crossing the Kalamazoo river to Kalamazoo Paper Mill No. 2. The complainant also purchased land which would have been unnecessary if the line had not been extended to the Bryant mill. It paid $1,500 to the G. R. & I. R. R. Co. for crossing under its track and paid one-half the expense for raising the track of the G. R. & I. R. R., while the Traction Company paid the other half. The expenses incurred in these improvements and purchases was approximately $71,000. All this was done without any protest from the defend-

ants, or any hint upon their part that it was not done in strict accordance with the contract. From this statement should perhaps be excepted the construction of the extension to Paper Mill No. 2. This extension was not included in the original contract. It is claimed by complainant that there was a parol agreement for this extension upon the same terms as those in the first contract.

The defendants executed and submitted a deed to the complainant for its approval, for this extension. It was satisfactory to complainant and was returned with request to insert the amount of the consideration when the complainant would pay the amount. Complainant made a verbal request to defendants for the deeds. In reply thereto Mr. Dewing received from the defendants the following letter, dated August 25, 1900:

"*Dear Sir:* In accordance with your verbal request we will prepare the deeds for the railroad right of way mentioned in writing of June 22, 1899, and the subsequent writing from you; we wish to state, however, that in order to get to our land and utilize it, it will be necessary for us to reserve the right to make and use three or more railroad crossings over the right of way that goes to you or the Chicago, Kalamazoo & Saginaw railway. We will therefore have the deeds prepared accordingly."

To this Mr. Dewing replied refusing to make any change in the contract, and demanded that a deed be executed in accordance therewith. No controversy had up to this time arisen between the parties. On November 1, 1900, the defendants wrote Mr. Dewing the following letter:

"*Dear Sir:* In relation to the disagreement between us as to deeds prepared for right of way for the extension of the C. K. & S. Railroad, we do not feel that we ought to or that we can give up what you ask. On the whole we think it best to withdraw all options heretofore tendered by us to you for the right of way for the C. K. & S. Railroad, and leave the matter for future arrangement. This we accordingly do. We believe, however, that there need be no trouble in coming to satisfactory terms."

On August 27th, prior to the date of this letter, Mr. Dewing had written to the defendants notifying them that he was ready to accept the terms of the contract and to receive the deed. Defendants knew that complainant had paid half of the expense for raising the tracks of the G. R. & I. so as to let the complainant's tracks go under it, and testified that complainant "could have had no other purpose to go under than to go to the Bryant Mill."

On October 22, 1900, defendants wrote complainant calling its attention to the fact that they had not yet received payment for the right of way. On the same day Mr. Dewing replied that he was ready to pay for a deed of the right of way when the defendants would make the deed in compliance with the contract.

The officers of the complainant had been considering for some years an extension to the south. One of the routes considered was to Marcellus, to connect with the Grand Trunk Railway, which would be a continuation of the line past the Bryant Mill. Other extensions had also been talked of, but the extension to Pavilion to connect with the Grand Trunk Railway there had not been thought of when the contracts were made. This extension was finally decided upon but not until the latter part of 1900; or the early part of 1901. It was constructed in the summer of 1901. It had not been determined upon until after the defendants refused to carry out their contract by the letter of November 1, 1900. The extension to Pavilion did not cross the G. R. & I., but went in a southeasterly direction from a point near the proposed crossing of the line to the Bryant Mill.

We need not make any further reference to the facts in this statement.

Proofs were taken in open court, and the circuit court entered a decree dismissing the complainant's bill on the ground that it had abandoned that part of the route covered in "Exhibit A" extending across the G. R. & I. to the Bryant Mill.

GRANT, J. (*after stating the facts*).   1. The contention of the learned counsel for the defendants, that the contract is too uncertain and indefinite to be specifically performed, is wholly without merit.   The defendants who were the originators of the proposed Belt Line had made a survey and a track had been laid a few years before upon a small portion of it.   A blueprint of the survey was given by the defendants to Mr. Dewing and was produced in evidence.   The original had been destroyed by a fire in which the factory of Lane & Lay had been destroyed. No one testified that there was any doubt as to the location of this strip of land described in the contract.   A complete answer, however, to this claim is that the complainant took possession of it with the express assent of the defendants and constructed their road thereon.   If there was any indefiniteness in the description it has been made definite by the action of the parties.   *March-Brownback Stove Co.* v. *Evans*, 9 Pa. Sup. Ct. 597; *Purinton* v. *Railroad Co.*, 46 Ill. 297; *Work* v. *Welsh*, 160 Ill. 468; 26 Am. & Eng. Enc. Law (2d Ed.), p. 36.   There is no word of testimony to indicate either that the parties did not understand the location of the land or that there was any disagreement as to its location when complainant took possession.   An exact and definite method had been agreed upon to determine the price to be paid, and the defendants themselves testified that they had prepared deeds for the conveyance of the land occupied.   A computation of the acreage of the strip to be conveyed could easily be made and the price per acre could easily be ascertained by ascertaining the price of the original cost per acre, with interest and taxes added, and multiply that by the number of acres conveyed.   Defendants admit that the consideration could thus be easily figured.

2. It is next urged that the contract was only a temporary memorandum containing nothing binding upon the parties, but that the terms were left to rest in parol. This contention is also without merit.   It was a contract for the sale of lands and for a deed to be executed ac-

cording to its terms.   There is no claim of fraud on the part of the complainant.   Mr. Dewing, representing complainant, was not the moving party in the negotiations which led up to the contract.   Mr. Hays appears to have been the originator and promoter of the proposition.   He first proposed it to Mr. Dewing and to the defendants. The defendants prepared a contract containing a short time limit for the construction of the road to the Bryant Mill.   Mr. Dewing declined to accept the contract containing this provision and it was destroyed.   A second one was drawn but it did not meet the approval of the parties, and was destroyed.   The defendants then submitted a new contract with the time limit omitted, and this was accepted, and the contract left in escrow with Mr. Hays on the conditions above mentioned.   Defendants now seek by parol testimony to again insert a time limit into the contract.

When the defendants assented to the refusal of Mr. Dewing to execute a contract with the time limit in and executed another with the time limit out, it eliminated entirely any question of specified time limit, and left it to be construed according to the rule of the common law. Mr. Dewing and his assignee would undoubtedly be required to construct the road within a reasonable time. The contract is complete in itself and contains all that is essential for its complete performance.   After the complainant had more than half completed its roadbed according to the contract, defendants sought to read into it by parol another provision not found in the written contract.   It provided that the complainant should have three crossings over the proposed belt line location.   It contained no provisions by which the defendants should have the right to make crossings of their own over complainant's road.   The crossing of one railroad by another or by private parties is a matter of great importance. Should the defendants desire to construct a belt line which should require crossings over the complainant's road, the law provides a way by which such right can be

obtained. If they had desired to obtain it by contract they should have spoken when they made the contract, and have insisted upon the insertion of such a provision in it. A party making a contract to sell land to another without any reservation of a right of way might as well insist that he should have a right of way over the land when he is called upon to make a deed. I know of no better illustration than this case affords of the wisdom of the rule holding that all prior negotiations and talks are merged in the written contract which parties make. It is not claimed that there was any previous agreement for such crossings. All parol testimony relating to conversations as to the time limit or other provisions was incompetent, and cannot be considered.

This was no hasty contract. All the parties to it were men of business, experience, and intelligence. The negotiations extended over a considerable time. The third contract was drawn before one was found acceptable to both parties. All parties understood the situation, and also understood what the contract contained, and its purport. To hold that this contract can be virtually laid aside by parol would be a virtual annulment of the rule that written contracts must control. *Adair* v. *Adair*, 5 Mich. 204; *Cohen* v. *Jacoboice*, 101 Mich. 409; *Helper* v. *Manufacturing Co.*, 138 Mich. 593.

A contract complete in itself cannot be converted into an idle and meaningless memorandum by parol evidence.

3. We cannot concur in the conclusion reached by the learned circuit judge, that the complainant had abandoned the construction of its road to the Bryant Mill, and in his refusal to grant specific performance for that reason. This finding rests mainly upon the testimony of the defendants and Mr. Hays. They testified that in conversations with Mr. James H. Dewing he informed them that he did not intend to construct the road from the G. R. & I. to the Bryant Mill. None of these conversations are claimed to have occurred until the roadbed was completed to the G. R. & I. and to Mill No. 2, and the de-

fendants had refused to give Mr. Dewing deeds for the land according to the terms of the contract. Mr. Dewing says that he told them that the company would proceed no further with the road until they had given the deed in accordance with the terms of the contract (and this complainant was clearly justified in doing), but denied positively ever telling them that the construction to the Bryant Mill was permanently abandoned. All the officers of the company testified positively that there never had been any talk or action on the part of the company looking towards such abandonment.

It is conceded by the defendants in their testimony and by counsel in their briefs that Mr. Dewing for the complainant entered into this contract in good faith; that the complainant constructed its road in good faith in accordance with it, but they claim that it was subsequently determined not to construct the road to the Bryant Mill after it had decided upon a connection with the Grand Trunk at Pavilion.

At the time defendants wrote their letter demanding further concessions and conditions, refusing to give deeds unless these were complied with, and also the letter attempting to rescind the contract, they had no knowledge that there was any intention to construct the road to Pavilion. They did not refuse to perform the contract on account of this extension, but for other reasons as above stated. In fact at that time it had not been determined to extend to Pavilion. The extension to Pavilion was no concern of the defendants. There was no agreement to construct the road by the Bryant Mill to Marcellus, several miles longer than to Pavilion. The object of the defendants in securing the construction of the road to the Bryant Mill was to open their land, known as the Reed Farm, for the location of manufactories and other buildings which manufacturers always require. The extension to Marcellus was of no benefit to them. The extension to Pavilion with the branch extending to the Bryant Mill was as beneficial to them as would have been

the extension of the Bryant Mill branch to Marcellus. The benefits to the defendants would have been as great in the one case as the other. The defendants having first broken the contract, the complainant and its officers were justified in refusing to go further with their road until the defendants tendered them the deeds. Complainant had tendered the money and has kept the tender good by a deposit in the bank for them. Neither law nor equity will, under these circumstances, permit the defendants to compel a forfeiture of the contract and the abandonment of the improvements which the complainant had made at large expense. Upon what principle, either of law or justice, could the defendants refuse to execute the deed and oust the complainant, who was guilty of no violation, from the possession of its property? The complainant had spent several thousand dollars in buying land not needed except for the extension to the Bryant Mill; in purchasing the right from the G. R. & I. to cross under its tracks, and the expense of raising them, and in the construction of its road to the G. R. & I., an extension not required except to reach the Bryant Mill; the officers of the complainant and the defendants were neighbors in the city of Kalamazoo; they took great pains to put their intentions in writing, first by contracts and then by correspondence, and in all this correspondence not even a hint is found of any intention to abandon the construction to the Bryant Mill. Defendants made no such claim as a cause for rescinding the contract. These acts are wholly inconsistent with the idea of abandonment and speak the truth more certainly than the uncertain memory of interested witnesses.

We think it clear upon the record that the road would have been constructed in a short time had it not been for the unjustifiable acts of the defendants.

4. Was there a verbal contract for the right of way for the extension from the main line to Mill No. 2, and was it executed in accordance with such agreement? The officers of the complainant testified that such a contract was

made, and that it was for the same consideration as that expressed in the first contract, viz., the price of the acreage based upon the cost of the land to the defendants, with interest and taxes added. The defendants admit that that was the agreement, with the condition that it was not to become binding until the road was completed to the Bryant Mill. In September, 1900, they prepared a deed of this strip of land which complainant had used and upon which it had erected its road to the paper mill, and submitted it to Mr. Dewing. It was made on the basis of the consideration above named, and the deed was complete except that it did not contain the amount of the consideration. No reference is made in it to any such consideration as the defendants now claim. It was satisfactory to the complainant, and was returned by Mr. Dewing to the defendants for the insertion of the amount of the consideration. We are satisfied that such an agreement was made and that it was fully performed by the complainant. If, however, the agreement were as the defendants claim, they waived that condition when they refused to perform the first contract, and thus prevented the construction to the Bryant Mill, and will not now be heard in a court of equity to take advantage of their own wrong to the detriment of the complainant.

5. Counsel for both parties cite authorities to the rule that the specific performance of a contract is not a matter of right in a court of equity, but rests in the sound discretion of the court or chancellor. It is unnecessary to cite authorities in support of this rule. This discretion is to be guided largely by the equities and justice of the case. If specific performance is denied the complainant may lose the large amount of money it has in good faith invested in the construction of its road, not only over the defendants' land, but also to Pavilion and the purchase of land therefor. It will either be compelled to abandon its road or take proceedings for condemnation, and run the risk of a finding by a jury that there was and is no necessity for the construction of the road. If, however,

the necessity should be found by a jury, it may be compelled to pay large damages on account of increased value of land since its road was built. This would undoubtedly be the case, unless the court should hold that the damages should be limited to the value of the land at the time the road was built. Specific performance will give to each party just what they contracted for and do no wrong or injustice to either. Under these circumstances, specific performance should be decreed.

Decree reversed, and decree entered in this court for the complainant, directing the defendants to execute the deeds in accordance with the contracts, and requiring the complainant to construct its road to the Bryant Mill within six months from the date of said decree, with costs.

MCALVAY, C. J., and CARPENTER, HOOKER, and MOORE, JJ., concurred.