PAMMEL *v.* PACIFIC MUTUAL LIFE INSURANCE CO. OF CALIFORNIA.

CONTRACTS—EVIDENCE—PREVIOUS NEGOTIATIONS.

> Where letters, preliminary agreements, and negotiations are finally reduced to writing in the form of a signed contract, and the testimony shows that such contract was intended by the parties to embrace the entire agreement, evidence of prior letters between the parties is inadmissible to supplement the written instrument.

Error to Berrien, Coolidge, J. Submitted April 13, 1909. (Docket No. 33.) Decided June 7, 1909.

Assumpsit by Gustave J. Pammel against the Pacific Mutual Life Insurance Company of California for breach of an agency contract. A judgment for plaintiff is reviewed by defendant on writ of error. Reversed.

*Stratton & Evans (Kronshage, McGovern, Goff, Fritz & Hannan, of counsel), for appellant.*

*Charles E. Sweet, for appellee.*

BLAIR, C. J. This is an action of assumpsit against defendant as the successor and assignee of the Conservative Life Insurance Company of California for commissions and salary claimed to be due—

" Under and by virtue of a certain contract in writing entered into by and between the said plaintiff and Conservative Life Insurance Company of California, a corporation organized under the laws of the State of California, which contract is dated November 28, 1903, and is supplemented by letter dated November 25, 1903, signed by Wilbur S. Tupper, vice president of said Conservative Life Insurance Company."

The contract, dated November 28, 1903, referred to in the declaration, was the usual agency contract for agents in the field soliciting applications for insurance. Although

dated November 28th, this contract was actually signed and transmitted to Mr. Lorenze, a managerial agent of defendant's predecessor at Milwaukee, on December 24, 1903. Plaintiff first went to work for the Conservative under an oral arrangement with Mr. Jasper E. Brady, its inspector of agencies. This arrangement was not confirmed by the company. Mr. Brady also negotiated with Mr. W. R. Thomson and Mr. Abraham Lorenze, and the company closed up these negotiations, and appointed Mr. Thomson inspector to look after business in the State of Wisconsin. Two contracts were made with Mr. Lorenze, which were produced at the trial. One was a general agency contract dated November 10, 1903, like plaintiff's contract of November 28th above referred to. The other contract, known as a managerial contract, is also dated November 10, 1903, and reads as follows:

"*Dear Sir:* The following is to be read in connection with, and forms a part of, your contract under even date herewith. The company appoints you as manager of its branch office, located at 126 Miller Building, Milwaukee. In consideration for your services in appointing, training and stimulating the field men to compose your branch, we will pay you the following consideration:

"1. A salary of one hundred dollars ($100.00) a month.

"2. A bonus based on the production of paid for business by yourself and the men of your branch for the first year, as follows:

"' $2.00 per thousand on a production of $500,000 or over.
$2.50 "      "      " "      "      " 600,000 " "
$3.00 "      "      " "      "      " 700,000 " "

"3. The company will pay for your accommodation the rent of its present offices, situated in the Miller Building, as above described, and from time to time, as business warrants, will furnish you such clerical help as is necessary for the handling of the business.

"Very sincerely yours,
"Wilbur S. Tupper, Vice President.

"I herewith accept the above proposition and agree to all the terms thereof.

"A. Lorenze."

In a letter dated November 4, 1903, Mr. Brady notified plaintiff that he had "taken up the matter of the Wisconsin situation with Mr. Tupper, and you will doubtless hear from him at an early date." On November 13, 1903, Mr. Tupper's secretary wrote for him to plaintiff a letter, containing, among other things, the following:

"Colonel Brady especially recommended three men from Milwaukee, of whom you were one. In making plans for the proposition which is to follow, Mr. Tupper was guided by a desire to utilize, if possible, all of the three men—Thomson, Lorenze and yourself. On account of his familiarity with the work already done in the State, he wished Mr. Thomson to travel through the State, writing new business and looking after the old business, keeping it in line, etc. This being disposed of, there remain yourself and Mr. Lorenze. Mr. Lorenze expressed a decided preference to Colonel Brady to remaining in Milwaukee—would consider a proposition nowhere else. On the other hand you expressed a willingness and desire to come to the Coast. We therefore have offered Mr. Lorenze the managership of a Milwaukee office and we wish you to come to the Coast on, or soon after, the first of the year. Meanwhile, we wish you would co-operate with Mr. Lorenze if he takes up the proposition, helping him to get matters into shape until January 1st. This will serve two purposes—enable Mr. Lorenze to get a plant started more quickly and familiarize yourself with policy plans and conditions. On or about January 1st we would like to have you come to the Coast, as before indicated. If you work meanwhile in Milwaukee and the matter of production warrants the same, we will contribute to your expenses of such removal one hundred dollars at the time of your coming; or if you should do little or nothing between this and the first of the year, which is improbable, we will still contribute one hundred dollars to your removal to the Coast, if within, say, two months of your arrival here your work justifies it."

To this letter plaintiff replied under date of November 19th, as follows:

"Replying to yours of the 13th inst., beg leave to say that so far as assisting in getting the agency established at Milwaukee I would be very glad to do so, and, while per-

sonally I have a desire to come to the Coast, I think by that time I could prevail upon my wife to move. I would, however, suggest that I be permitted to remain in Milwaukee at least until February or March 1st, or thereabouts. No doubt Mr. Brady has laid before you the proposition he made me in full, which was based both upon salary and commission, and as I take it to assist in building up the agency and getting it established the company would be willing to pay both the salary and commissions as outlined by Mr. Brady in view of the services I believe I could render them, especially from the viewpoint of securing agents for the company aside from any personal business that I might be able to write. Of course, it is my desire, as I told Mr. Brady, to get in close touch with the agency department and finally, if found competent by the company, to work myself into the home office agency work directly for the company. I feel at this time as though with my personal acquaintance in the State and with the insurance fraternity in this section of the country, I could be of more aid to the company, as well as to the Milwaukee office, right here than I could in California where I have absolutely no acquaintance and where it might take a little while to build up a business. I prefer that in the meantime, and before coming to California, you should make such inquiries regarding my insurance ability, etc., to satisfy yourself as to my qualities for filling any position which you might desire to offer me for California. * * *

" In reference to your policy forms, contracts, etc., will say that I am thoroughly familiar with them, having fully posted myself upon them as well as the methods of the company so far as I could. I am prepared to give full advice and instructions to agents or do any special work of this character that you might desire to outline to me. As I understood Mr. Brady's proposition when here, the State was to be subdivided into districts, and I believe that I could secure for you several good producing district agents in certain sections of this State where I have a large personal acquaintance. I will take this matter up with Mr. Lorenze today so far as starting in immediately and securing business is concerned and establishing agents, and hope to hear from you by return mail outlining fully your proposition so far as compensation, etc., is concerned."

On November 25, 1903, Mr. Tupper wrote the follow-

ing letter, referred to in the declaration as the letter supplementing the contract of November 28, 1903, viz.:

" I have your favor of the 19th inst. It seems that you have entirely misunderstood my last letter to you. I stated in that communication that we had open one position as described by Colonel Brady; that we had both yourself and Mr. Lorenze as candidates for this position; that you had expressed a desire or willingness to Colonel Brady to come to California; and that, therefore, we had offered the place in question to Mr. Lorenze. This place he has accepted. In acting as we have done, we thought that we were acting in accordance with your desires and wishes, and furthering your best interests. Since you had expressed a desire to come to California, I suggested in my last communication that you put in some time in our Milwaukee field in connection with our Milwaukee branch, and that early next year you remove to California according to terms outlined in the letter just referred to. This will give you a chance to make quite a little money in the field at Milwaukee, owing to your acquaintance at that point. It will further give you the opportunity to come to California at no expense to yourself, and, once here, you have our assurance that your advance in our ranks will be limited by your ability alone. *The agency contract which you will have while working in connection with the Milwaukee office will be identically the same as that held by Mr. Lorenze, and we have this day written him to explain the contract to you.* Understanding our plans and methods as you do, you will be enabled to close a lot of business for such men as you will be able to procure for the company, thus getting the cream of the business and netting you a large earning during your temporary stay in Milwaukee. I trust that I have cleared up the matter of your connection with us in the above. I thought I had made it perfectly clear to you in my last communication. If you can take hold of the work in Milwaukee by simply going out in the field and getting business, you will gain our confidence more than you could in any other way. *I shall be pleased to be favored with early advices from you.*"

Plaintiff testified that the form of the contract which he later signed was first shown to him in triplicate by Mr. Lorenze about the 15th of November, as the contracts the

company desired him to sign; that he refused to sign such a contract, but took the matter up again with Mr. Lorenze on November 28th, when the contracts which he afterwards signed were written, and at which time he had the letter of November 25th.

"*He came to me feeling satisfied I would now sign them, since I had the letter from Mr. Tupper, but he did not show me any additional compensation, so I refused to sign them. I saw Mr. Lorenze about these contracts thereafter several times in the month of December. It was the last time, December 24th, that he showed me this agreement. He showed me then an agreement similar to Exhibit 7 and the additional agreement.* I can't remember at the present time whether the three copies of Exhibit 7 were signed by Mr. Tupper or not, but I do remember that *this additional agreement which Mr. Lorenze showed me was signed by Mr. Tupper.* * * * *I think, if my recollection is right, it was on a sheet of letter paper, outlining exactly what the proposition was.*

"*Q. You don't remember whether it was signed by Mr. Lorenze or not?*

"*A. No, sir.*

"*Q. Then you remember it was in the shape of a letter to Mr. Lorenze?*

"*A. As I remember it now, it was.* I would not say positively, but that is my recollection. * * * Mr. Lorenze showed me a contract which had been executed by him similar to Exhibit 7, which I went over carefully, and found that contract practically identical to the contract here marked Exhibit 7 as to its terms and conditions. * * * I saw the letter before I signed the contract, and I also saw the contract which Mr. Lorenze showed me before I signed the contract.

"*Q. State what it contained.* * * *

"*The Court:* This is the contract with Lorenze to which the letter of Mr. Tupper refers?

"*Mr. Sweet:* Yes, sir. * * * The brokerage commission was 50 per cent. graded contract with an underwriting profit of 15 per cent. on agents' work and your own in addition. By the 15 per cent. I mean he was to get 15 per cent. over and above the regular contract price. This would give 65 per cent. on some classes of business

—20 payment life, 20-year endowment, and 20-year distribution policy. On the shorter term policies there was a little smaller commission — graded down. The contract will speak for itself. And in addition to which there was to be 2 per cent. collection fee on all Wisconsin premiums, old premiums written before we were in the office. There was to be a salary of $100 per month and a renewal commission of 20 per cent. the first year graded to 7½ per cent., I think it is; 7 per cent. credit the second year and thereafter on renewal of policies written by myself. Renewals applied only to my personal business. The first year I was to get 65 per cent. of the premium, the second year I was to get 20 per cent. of it, the third year would get 7 per cent., and subsequent years as long as the premiums were paid, and 2 per cent. on all the Conservative Life collections in the State of Wisconsin. That was under what I called a contract supplemental to Lorenze's regular contract. *Lorenze also had a contract such as I signed.* After that I signed a contract which I then had for signature with this company. [Examining a paper.] That is the contract. Plaintiff offered in evidence this contract, dated November 28, 1903, and it was admitted and marked 'Exhibit 7.' * * * I did not take this contract, Exhibit 7, home with me and read it over. I delivered it to Mr. Lorenze in person. I dictated this letter, Exhibit 18, right in the presence of Mr. Lorenze at his request to get strong with the company himself. * * * The contract, the letter of Mr. Tupper and the document shown me by Mr. Lorenze, fixed the commission which I am entitled to for writing insurance with the Conservative Life Insurance Company. I claim I am entitled to 65 per cent. commission on new business written by myself under my contract with the Conservative Life Insurance Company. That percentage was fixed by the contract and document shown me by Lorenze, in connection with a letter received from Mr. Tupper. Fifty per cent. of that commission was provided for by Exhibit 7. I considered Exhibit 7 a part of a contract with the company. The other 15 per cent. I also claim under a contract with the company. While Lorenze was there I received it."

Plaintiff was a witness in a suit between Lorenze and the Conservative Company:

"In that trial I was asked this question: 'On what basis were you working for the Conservative Life Insur-

ance Company under a contract with them?' And I made answer: 'I was working under a contract I signed with Mr. Lorenze with the express stipulation that I did not waive my right to claim a salary under an agreement entered into with their manager or agent when he was here, Mr. Col. Jasper E. Brady.' * * * In that trial this question was asked me: 'That is, you had an oral understanding with Mr. Brady?' And I made answer: 'Yes, sir.' In that trial this question was asked me: 'And subsequently entered into a written contract with Mr. Lorenze?' And I made answer: 'Yes, sir.' In making the reply, 'Yes, sir,' to this and in referring to Mr. Lorenze, I always, being under the impression that Mr. Lorenze represented the company, meant the company, and want it so understood at this time. At that time in that trial this question was asked me: 'Have you that contract so that you can produce it?' And I made answer: 'Yes, sir.' In that trial this question was asked me: 'Then as far as soliciting new business was concerned, Mr. Pammel, you were working under a contract between yourself and Mr. Lorenze?' To which I answered: 'My contract is with the company. *I had an oral agreement with Mr. Lorenze on commissions aside from the contract.*' In that trial I was asked this question: '*Then your written contract was with the company?*' To which I answered: '*Yes, sir.*' In that trial this question was asked me: '*The contract will speak for itself as far as commissions are concerned?*' To which question I made answer: '*Yes; that is, so far as commissions with the company are concerned. Mr. Lorenze allowed me the full commission that Col. Brady promised me when he was here.*' * * * *In that trial before Commissioner Ryan this question was asked me:* '*Was that 65 per cent. paid to you under an arrangement between you and the company or between you and Mr. Lorenze?*' *To which question I answered:* '*Between me and Mr. Lorenze.*' In that trial this question was asked me: 'That is, 15 per cent. additional?' To which question I answered: 'Yes, sir; my arrangement with the company is 50 per cent. with a 20 per cent. renewal.'

"Q. *Mr. Kronshage:* Was it true?

"A. In a measure; yes, sir.

"Q. Was it true or false?

"*A.* It was true as far as it went. Put it that way. It was not a complete answer.

"*Q.* You want now to modify that by saying the commission arrangement with your company was 65 per cent. would you?

"*A.* I would say it is in accordance with letter, the other contract and evidence I put in here."

On December 24, 1903, plaintiff wrote and transmitted to Lorenze the following letter:

"MILWAUKEE, WIS., Dec. 24, 1903.

"Mr. A. LORENZE, Manager, Conservative Life Ins. Co.,
"City.

"*Dear Sir:* Have carefully read over the letter of Mr. Behrens, secretary to the vice president, and upon your solicitation and special request sign a contract at this time am herewith enclosing you the contract originally submitted to me, properly signed. *All other matters and differences I shall take up with the company at some later date when I can have a personal interview with the officers of the company, who might be in authority.* The matter of $100 does not cut 'any ice' with me, only that I wanted exactly what I was entitled to. *I have a memorandum of the proposition made me by Col. Brady,* and while my confidence in the inspector of agencies is very much shaken, and I would personally have nothing to do with him, under any conditions by reason of the statements made to me, I will say that my confidence in Mr. Rindge, the president of the company, is unbounded. That I have confidence in the company I assure you fully at this time, and, while I may not have confidence in the statements made by some one single individual whose authority it appears is very limited, I shall continue in the service of the company, if they care to have me, at least for the time being. I shall not, however, under any conditions, until my confidence is fully restored, come to the Coast. My connection with companies I have been with in the past have been such that I did not lose my identity in any way, as I am doing now with the Conservative. Yet I feel that time will tell, and when I can have a personal interview with Mr. Rindge and show him a few memorandums that I can fully satisfy him that I have not been justly treated. Of course, I am frank to admit that I did not have the fullest confidence in Col. Brady's talk when he was here, as he did

not impress me as favorably as he might have, and had it not been for previous conversations with Mr. White, of Leonard & White, and my confidence in the methods and policy contracts of the company I should not have been attracted to them in the first place. My contract with the Northwestern National was a much more liberal one than the contract I have today. I will show the company fully that I can make good thousands of miles away from the home office of the company, not because the people I solicit know anything about the company but that they know me personally, and know that I would not represent anything that was not proper. After a few years' experience with my business the company will find it is the kind that pays them to write— mainly that which stays on the books of the company and which ultimately proves profitable.

I fully appreciate the fact that the company either owes me or it does not, but I am willing to leave that go until I can see the officers of the company and submit my whole proposition to them, which I hope to do in due time. As I stated to you in my letter of the 16th inst., the old matters and differences between the company and myself are entirely separate and distinct from my present or future connections, and shall always be treated by me in that manner. There might be simply a difference of understanding between Col. Brady's proposition to me and my own understanding of it, but I will be perfectly willing to leave that part of it to any fair minded man of the company who knows the position and understands it fully, and am satisfied they will look at it from a different standpoint from the one they are at present assuming. I want nothing that does not belong to me. In my 15 years of experience in insurance work I have oftentimes not received all that was coming to me from agents and others in my employ, but will say from those above me I have always been treated courteously and with consideration, and I expect in time to get the same from the Conservative. There is one thing that I would not do—I would not work for any company where I was obliged to lose my identity and relegated to a minor position, as my aim always has been advancement, and not retrogression. While I appreciate the fact that the Conservative is a young company, and there is room for advancement, yet I believe that Mr. Rindge's position always would be advancing people for services performed and general knowledge and fitness for positions, at least from all I can

learn (and I have made inquiries from friends of mine in Los Angeles). This is the information that I have received. Absolute trust and confidence I should place in the president of the company, and, after all, I believe the president of the company is the actual head. I expect some time in March or April to take a trip to the West, and, if I do, I shall go to Los Angeles also and become personally acquainted with the heads of the company. With the assurance from me that I shall forget the differences that have existed, and that I shall endeavor to prove my ability for writing business not alone volume, but class as well, I remain,

"Yours very truly,
"G. J. PAMMEL,
"Acting Asst. Manager."

Plaintiff stated that the managerial contract with Lorenze produced by defendant and hereinbefore quoted was not the one shown to him by Lorenze. It is plaintiff's position that he performed his services, in the language of his counsel, "under the terms of both contracts, neither one interfering with the other; the supplementary contract simply adding to the compensation provided in the general agency contract."

The case was submitted to the jury by the court, and plaintiff recovered a verdict in accordance with the terms of the supplemental contract. Defendant brings the record to this court for review, assigning numerous errors. Among other errors assigned, are several to the effect that the court erred in permitting parol testimony as to the terms of the alleged supplemental contract to vary the terms of the written contract signed by the parties. We are of the opinion that these assignments were well founded; and, since such conclusion practically disposes of the case, we do not deem it necessary to consider the other points presented by the elaborate briefs of counsel. It seems manifest that from the beginning the parties contemplated the making of a written contract. The communications between them from the outset were designed to ascertain the terms upon which they could agree, and which should be embodied in a written contract to ex-

plicitly and finally determine the legal relations of the parties. The letter of November 25, 1903, was merely one of the steps in the preliminary negotiations. Its conclusion, "I shall be pleased to be favored with early advices from you," demonstrates that it was not intended to form a part of a contract then existing or thereafter to be accepted. Its entire terms demonstrate that it was intended to be explanatory of the character of contract which plaintiff was later to sign. The obvious purport of the language referring to the agency contract "held by Mr. Lorenze" is:

"The *written* agency contract which you will have while working in connection with the Milwaukee office will, *when legally executed,* be identically the same as that held by Mr. Lorenze, and we have this day written him to explain the contract, *which you are to execute,* to you."

The contract signed by plaintiff was, in fact, identically the same agency contract as that held by Mr. Lorenze. It was the final consummation of the negotiations of the parties, and must be deemed in law to embrace their entire agreement. 2 Parsons on Contracts (9th Ed.), pt. 2, chap. 1, § 10; *Lyman* v. *Robinson,* 14 Allen (Mass.), 254; *Townsend* v. *Peasley,* 35 Wis. 383; *Hunter* v. *Hathaway,* 108 Wis. 620 (84 N. W. 996); *Hough* v. *Brown,* 19 N. Y. 111; *Helper* v. *Manufacturing Co.,* 138 Mich. 593 (101 N. W. 804); *Tradesman Co.* v. *Manufacturing Co.,* 147 Mich. 702 (111 N. W. 343, 112 N. W. 708); *Chicago, etc., R. Co.* v. *Lane,* 150 Mich. 162 (113 N. W. 22).

The judgment is reversed, and a new trial granted.

GRANT, MONTGOMERY, MCALVAY, and BROOKE, JJ., concurred.